UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**K BAR A RANCH**,

Debtor.

Case No. **1:22-bk-10004-BPH**

# MEMORANDUM OF DECISION

## I. Introduction.

In this chapter 12 bankruptcy,[1] this Court is tasked with parsing through an oversecured creditor's legal fees and Debtor's objection to those fees because the fees are allegedly unreasonable. It is a tedious task, made more tedious by the application's lack of detail or explanation for the necessity of the fees in a case that was neither complex nor novel. Despite the fatiguing nature of the task, it is particularly important because any fees approved as reasonable will in essence be reimbursed by Debtor through its confirmed plan. For the reasons stated below, this Court approves $12,500, in fees and denies the remainder as unreasonable for purposes of § 506(b). This Court approves reimbursement for costs.

## II. Procedural Background.

First Pioneer National Bank ("Creditor") filed an "Application for Professional Fees and Costs" requesting approval of fees and costs for its attorneys (collectively, Creditor and its counsel are "Applicant").[2] The Application requests an award of fees in the amount of $49,767 and reimbursement for costs in the amount of $6.70. In total, Applicant requested $49,773.70. In response, Debtor filed an Objection to the Application.[3]

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] ECF No. 114 ("Application"). Applicant subsequently submitted a "Supplemental Table in Support of Application for Professional Fees and Costs" at ECF No. 166 ("Supplemental Table"), indicating that Applicant had applied "additional discounts/reductions" bringing the amount requested to $45,510.20 ("Total Amount"). However, this Court cannot ascertain Applicant's method of reduction. As a result, certain elements of this Court's analysis of the Application may overlap with reductions already applied by Applicant.

[3] ECF No. 127 ("Objection").

1

A hearing on the Application was held and the parties argued their respective positions.[4] No exhibits or testimony were introduced. At the end of the hearing, this Court informed the parties it would take the matter under advisement.

### III. Factual Background.

Debtor filed its chapter 12 petition on January 18, 2022. Creditor filed a proof of claim in the amount of $3,970,421.45 which was later amended by a stipulation with Debtor to $4,085,158.56 ("Claim").[5] According to the Claim, the value of the real property securing the debt has a market value of $9,520,000. Creditor's Claim is protected by a 233% equity cushion.

Debtor's initial chapter 12 plan proposed to pay Creditor's Claim with an interest rate of 4%.[6] Under the Plan, Debtor would provide annual installments of $234,727 over a term of 30 years commencing on plan confirmation.

Creditor objected to the Plan.[7] In its Plan Objection, Creditor argued that the proposed interest rate did not include an upward adjustment for risk, resulting in a possible windfall for Debtor at the expense of Creditor. Creditor additionally argued that the proposed 30-year payment term in the Plan greatly exceeded Debtor's original obligation. Confirmation of the Plan was denied.[8]

In the intervening time between filing the Plan and the Plan Objection, the chapter 12 Trustee held a preliminary plan conference on May 23, 2022.[9] Although it appeared all issues were resolved at the conference, the Debtor and Creditor quibbled over the language included in a stipulation documenting their agreement. As a result, the Trustee held another preliminary plan conference on June 28, 2022. At this conference, the parties reached an agreement in principle a second time, but once again could not agree on the language for purposes of a stipulation. Specifically, Creditor wanted to include a "status quo" provision that explicitly provided that each covenant, term, and obligation in the prepetition agreements between the parties would not be changed absent express modification in the Plan.[10]

---

[4] ECF No. 161.

[5] Claim No. 3-1 on the Claim Register; ECF No. 74 ("Stipulation").

[6] ECF No. 40 ("Plan").

[7] ECF No. 50 ("Plan Objection").

[8] ECF No. 57.

[9] Preliminary plan conferences are organized by chapter 12 trustees and reflect an effort by the chapter 12 trustee to resolve objections. These efforts are undertaken in part because the timeline for confirmation in chapter 12 cases is very short. 11 U.S.C. § 1221; 11 U.S.C. § 1224.

[10] A status quo provision expressly preserves terms in prepetition contracts. *See, e.g., United States v. Goff*, 2005 U.S. Dist. 49884, at *26 (D. Idaho 2005). Such provisions provide that certain terms contained within the underlying loan agreement, such as remedies for default and acceleration of debt payments, are preserved post-confirmation. *Id.* Absent a status quo provision, a court may interpret the confirmed plan to override the prepetition provisions. *See Navistar Fin. Corp. v. Jim*

2

Having reached an agreement twice, only to have the parties' efforts scuttled when drafting a stipulation, Debtor filed a "Motion to Enforce Settlement."[11] Creditor objected to the Motion to Enforce.[12] Debtor responded by filing an Objection to Creditor's Claim.[13]

Debtor filed an amended plan on August 12, 2022.[14] The Amended Plan increased the interest rate and provided for annual payment of $271,756 over a term of 30 years commencing on plan confirmation. Creditor again objected to the Amended Plan.[15] The Amended Plan Objection highlighted multiple issues, but its primary focus involved the Amended Plan's failure to include a status quo provision.

Debtor and Creditor ultimately reached an agreement on the outstanding issues. Remarkably, this time the parties agreed on the language and form of the Stipulation.[16] Pursuant to the Stipulation, Debtor agreed to include a status quo provision in the Amended Plan and withdrew its Motion to Enforce and Claim Objection.[17] In return, Creditor withdrew its Amended Plan Objection. Debtor's Amended Plan was confirmed.[18]

Creditor filed the present Application pursuant to § 506(b). No contested hearings were held on any of the above matters, except the Application. Notably, counsel for Debtor filed an "Interim Application for Compensation" roughly a month prior to the Application.[19] Debtor's Application, which includes Debtor's disputes with Creditor along with the additional tasks and duties required of Debtor's counsel, requested $22,655.50 in fees compared to the approximately $50,000 in fees requested by Applicant. Notably, Debtor's counsel billed approximately 60 hours less than Applicant.

Following the hearing, at this Court's request, Applicant submitted an itemized table that

---

*Palmer Trucking*, 2012 U.S. Dist. 20510, at *12-13 (D. Mont. 2012) (holding that a creditor could not accelerate maturity of debt owed to it by the debtor because plan did not expressly contain acceleration clause). Creditor relied on this case in its objections to confirmation.

[11] ECF No. 54 ("Motion to Enforce").

[12] ECF No. 67.

[13] ECF No. 68, Claim No. 3-1 on the Claim's Register ("Claim Objection").

[14] ECF No. 69 ("Amended Plan").

[15] ECF No. 71 ("Amended Plan Objection").

[16] ECF No. 74 ("Stipulation"). This Court approved the Stipulation in its Order issued at ECF No. 75.

[17] ECF Nos. 76 and 77.

[18] ECF No. 79.

[19] ECF No. 96 ("Debtor's Application").

3

detailed each timekeeper, the total hours billed, hourly rate and total fees requested.[20] The Supplemental Table explains that after additional discounts or reductions, the Total Amount sought is $45,510.20. The Supplemental Table is reproduced here:

| Timekeeper | Total Hours | Hourly Rate | Compensation |
|---|---|---|---|
| Eli Patten | 114 | $330 | $ 37,521 |
| Dylan Crouse | 23.10 | $255 | $ 5,890.50 |
| Robert Joki | 14.80 | $250 | $ 3,700 |
| Tamara Melia | 0.40 | $175 | $ 70 |
| | 152.30 | | $ 45,510.20 |

IV. **Parties' Arguments.**

A. **Creditor's Argument.**

The Application explains that Applicant has the right to post-petition legal fees and costs as representative of an over-secured creditor pursuant to § 506(b). The Application states that the standard hourly rates billed were Eli Patten at $330, Dylan Crouse at $255, Robert Joki at $250, and Tamara Melia-Woodward at $175. The Application did not explain whether the fees were reasonable pursuant to Mont. LBR 2016-1(f).

At the hearing, Applicant argued that the work Applicant undertook was to protect Creditor's secured status. Applicant further argued that the issues were relatively unique and required additional time to research. Applicant acknowledged that significant time was spent communicating with Creditor because Creditor did not ordinarily extend credit to a borrower outside its traditional market in Colorado. As Applicant indicated at the hearing, one of Creditor's preferred customers is the father of Mark Thompson, a member of Debtor. Based on that relationship, Creditor made a loan to Debtor. Applicant explained that Creditor's lack of familiarity with this Court required more frequent communication than typical. Applicant stated that the fee request amounted to approximately 1% of Creditor's claim amount. Applicant further explained that Applicant undertook a significant amount of time attempting to resolve the matters informally because of this Court's stated preference for compromise. Applicant provided no case law in support of their position in the Application or at the hearing.

B. **Debtor's Argument.**

Debtor agrees that Applicant is entitled to fees pursuant to § 506(b). However, Debtor disputes the reasonableness of the fees requested, citing prior decisions by this Court. In its Objection, Debtor argues that certain time entries should be disallowed due to their unnecessary, unbeneficial, or duplicative nature. The Objection indicates that Debtor's case has been relatively straightforward and that there were no actual contested hearings or any other major issues that warrant the hours Applicant spent on Debtor's case.

Debtor argues that a significant amount of time billed by Applicant is unreasonable because it was unnecessary to the protection of Creditor's claim. The Objection notes that the Application reflects that some work should have been delegated to an attorney with a lower billing rate. Further, Applicant spent an inordinate amount of time explaining bankruptcy fundamentals to

---

[20] Supplemental Table, ECF No. 166.

Creditor, including, for example, billing for status updates on items such as Debtor's schedules. A comparison of Applicant and Debtor's time entries shows that Applicant spent more time explaining Debtor's schedules to Creditor than what it took Debtor's counsel to complete the schedules.

V.   **Applicable Law and Analysis.**

   A.  **Section 506(b) generally.**

A creditor's claim is a "right to payment, whether or not such right is reduced to judgment, . . . unliquidated, fixed, contingent, . . . disputed, undisputed, legal, [or] equitable." § 101(5)(A). A creditor asserts this "right to payment" through the filing of a proof of claim in a debtor's bankruptcy case. § 501. In certain instances, oversecured creditors may include post-petition interest, fees, costs and charges as components of their secured claim pursuant to § 506(b).[21] Section 506(b) states:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

Section 506(b) applies to the award of attorney's fees to oversecured creditors with a contractual right to reimbursement. *In re Salazar*, 82 B.R. 538, 540 (B.A.P. 9th Cir. 1987). A creditor is entitled to a claim for attorney's fees under § 506(b) if: (1) the claim is an allowed secured claim; (2) the creditor is oversecured; (3) the fees are reasonable; and (4) the fees are provided for under the underlying agreement between a debtor and a creditor. *Countrywide Home Loans, Inc. v. Hoopai (In re Hoopai)*, 581 F.3d 1090, 1098 (9th Cir. 2009) (internal citations omitted). Section 506(b) only governs fees up to the confirmation or the effective date of the plan. *Id.* at 1099. Accordingly, a creditor may only seek approval of fees under § 506(b) for those fees incurred between the petition date and confirmation or the effective date of the plan. If a secured creditor seeks attorney's fees pursuant § 506(b), an application for fees must be submitted for this Court's approval. Mont. LBR 2016-1(f). Generally, the singular issue this Court must determine is reasonableness. Such is the case here.

   B.  **Reasonableness.**

Debtor does not dispute that Creditor has an allowed secured claim, Creditor is oversecured, and Applicant's fees are provided for in the underlying promissory note and security agreement that serves as the basis of Creditor's Claim. However, Debtor objects on the grounds that Applicant's fees are unreasonable, highlighting that Applicant requests over twice Debtor's counsel's approved fees, the Application is inconsistent with this Court's prior decisions, and Creditor's substantial equity cushion undermines any concerns it had in this case.

Section 506(b) does not offer a blank check for an oversecured creditor. *In re Dalessio*, 74 B.R. 721, 723 (B.A.P. 9th Cir. 1987). The bankruptcy court has substantial discretion when considering an application for attorney's fees pursuant to § 506(b). *Id.* at 724. The party seeking

---

[21] A creditor is considered to be "oversecured" when the value of its collateral exceeds the amount of the creditor's allowed claim. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 239 (1989).

5

fees has the burden of proof to show that fees are reasonable. *In re Atwood*, 293 B.R. 227, 233 (B.A.P. 9th Cir. 2003).

As the BAP explained:

Reasonableness embodies a range of human conduct. The key determinant is whether the creditor incurred expenses and fees that fall within the scope of the fees provision in the agreement, and took the kinds of actions that similarly situated creditors might reasonably conclude should be taken, or whether such actions and fees were so clearly outside the range as to be deemed unreasonable. The bankruptcy court should inquire whether, considering all relevant factors including duplication, the creditor reasonably believed that the services employed were necessary to protect his interests in the debtor's property.

*In re Dalessio*, 74 B.R. at 723. Conversely, an oversecured creditor should not be paid attorney's fees for unnecessary or redundant tasks or "for doing the very thing any creditor, unsecured as well as secured, is entitled to do under the Bankruptcy Code." *Id.* at 723-24. The bankruptcy court has the discretion to determine the method under which it assesses fees as reasonable. *In re Kitchen Factors, Inc.*, 143 B.R.560, 562 (B.A.P. 9th Cir. 1992).

Notably, this Court does not question the reasonableness of the action taken. Creditor's insistence that language be included in a stipulation recognizing that a proposed plan would not modify each covenant, term, and obligation in the prepetition agreements between the parties except as specifically stated is defensible. Similarly, Creditor's challenge to the rate of interest it was to receive under the Plan was justifiable. However, it is not the relief requested (i.e. reimbursement of fees for defending Creditor's position) that concerns this Court, but rather the Total Amount that gives this Court pause.

This Court previously outlined some of the factors it relies upon to determine if a request for fees pursuant to § 506(b) is reasonable. *In re Olson*, 2020 Mont. B.R. 137 (Bankr. D. Mont. 2020). These factors are:

(1) the nature, extent, length, and value of the services rendered;
(2) the bankruptcy and non-bankruptcy experience, reputation, and ability of the lawyers;
(3) awards in similar cases;
(4) the novelty and difficulty (or lack thereof) of the questions presented;
(5) the skill requisite to perform the legal services properly;
(6) the customary fee;
(7) professional time actually spent;
(8) amount involved in potential risk;
(9) results of the cases;
(10) specialty in which attorneys may be practicing;
(11) fees sought to be applied;
(12) distinction between partner and associates time;
(13) costs of comparable services;
(14) use (or lack thereof) of paralegals;
(15) duplication of efforts; and

6

(16) fees sought in proportion to the claim.

*Id.* These factors were incorporated into Mont. LBR 2016-1(f). Under Mont LBR 2016-1(f), each application pursuant to § 506(b) must individually explain whether the fees are reasonable, with resort to the factors, or specific reference to events in the case.[22]

Here, the Application itself provides little to no explanation why Applicant's fees are reasonable. In large part, it appears that Applicant simply submitted its time entries wholesale, inviting this Court to determine what is unreasonable. This defect alone would ordinarily be enough to deny the requested relief without prejudice for failure to comply with the local rules. However, this Court has endeavored to provide a thorough explanation for its reasoning so that counsel representing oversecured creditors may avoid denial or reduction of their fees for unreasonableness in the future.

Prior to discussing specific factors, this Court notes that hourly rates in this district are not uniform and approximately range from $225 to $375 for creditor's work. No locality rule is applied to artificially limit the hourly rate an attorney elects to charge a client. *In re Jore Corp.*, 20 Mont. B.R. 158 (Bankr. D. Mont. 2003). Other than their normal hourly rates, this Court is not aware of a "customary fee" that creditor's counsel may charge for their services. Similarly, just as hourly rates vary, so does the professional time actually spent on a matter. An experienced attorney with a higher billing rate should be efficient. If it takes an experienced timekeeper one hour to complete a task and that attorney has a billing rate of $350/hour, this Court would expect a less experienced attorney with a billing rate of $250/hour to complete the same task in roughly 80 minutes. Although this reflects an expectation, this Court acknowledges timekeeping and billing is less scientific than either attorneys or courts would like. Instead, this Court and practitioners must apply their experience to reasonableness determinations.

The timekeepers for Creditor and Debtor in this matter illustrate the range of hourly fees charged. Debtor's counsel who has been admitted since 1987 and specializes in bankruptcy, charges an hourly rate of $370. In Applicant's case, the timekeepers reflect a range of experience. For example, Patten was admitted 2009 and has appeared in 136 bankruptcy cases;[23] Crouse admitted in 2018 and appeared in 18 cases. Joki was admitted in 2021 and has never appeared before this Court. Melia is an experienced paralegal and has worked on innumerable cases.

### 1. Similar work in similar chapter 12 cases suggests the fees requested are not reasonable for purposes of § 506(b).

Section 506(b) applications in a chapter 12 bankruptcy are not uncommon in this district, and this Application has caused this Court to examine prior orders approving § 506(b) applications.

---

[22] Case law has identified different factors that courts apply when assessing the reasonableness of fees. These factors vary. Mont. 2016-1(f) is meant to provide practitioners guidance on some commonly identified factors. While it is not necessary to discuss each factor in a § 506(b) application, practitioners should do more than print time entries and place the burden entirely on this Court to parse through the docket and scrutinize time entries.

[23] The number of appearances is taken from this Court's CM/ECF.

A study of previous § 506(b) highlights the stark difference between this Application and others. This Application requests fees significantly higher than other applications and lacks thoughtful application of this Court's prior § 506(b) decisions.

In cases with similar issues, this Court has approved requests for fees totaling approximately $10,000. For example, in *In re Somerfeld*, this Court approved fees in the amount of $9,223.75.[24] In *Somerfeld*, the creditor and the debtors negotiated a preliminary cash collateral stipulation.[25] The creditor objected to two proposed plans filed by the debtors on the grounds that they were not feasible and paid the creditor at below prime interest rate.[26] The creditor further objected to the debtors' continued use of cash collateral, and subsequently negotiated an agreement with the debtors.[27] These objections were ultimately resolved by stipulation with the debtors, resulting in plan confirmation.[28]

As a result of this work, the applicant billed approximately 40 hours. Counsel billed the majority of this work (37.40 hours at an hourly rate of $245), while a paralegal billed .45 hours at a rate of $135. The amount requested was less than $10,000, suggesting that the applicant was efficient in his work on behalf of the creditor.

Similarly, in *In re Kapperud*, this Court approved fees in the amount of $13,597.05 pursuant to § 506(b).[29] In *Kapperud*, the creditor objected to the debtors' initial plan on feasibility grounds and that the plan contemplated payments to the creditor that would conflict with the terms of the underlying loan agreement.[30] The debtors drafted a second amended plan, resolving the creditor's concerns.[31] Finally, the creditor and the debtors entered into a Rule 9019 compromise, resolving the debtors' contingent claims against the creditor without further litigation.[32]

For these efforts, counsel for the creditor spent approximately 67 hours on the matter: 45.5 hours were billed by a partner at an hourly rate of $275, 8.4 hours were billed by an associate at an hourly rate of $205, and 13.1 hours were billed by a paralegal at an hourly rate of $165.[33] As the

---

[24] 2:18-bk-61149-BPH at ECF No. 139.

[25] *Id.* at ECF No. 83.

[26] *Id.* at ECF No. 90 and 105.

[27] *Id.* at ECF Nos. 91 and 106.

[28] *Id.* at ECF Nos. 111 and 126.

[29] 2:19-60946-BPH at ECF No. 125.

[30] *Id.* at ECF No. 66.

[31] *Id.* at ECF No. 67.

[32] *Id.* at ECF No. 107. The compromise was approved by this Court at ECF No. 113.

[33] *Id.* at ECF No. 119.

application in *Kapperud* explained, although the applicant accumulated fees in the amount of $17,205.05, counsel endeavored to apply this Court's previous guidance and reduced the professional fees sought in the proceeding by $3,608, excluding: (1) fees and costs related to matters that any creditor would have to undertake (i.e. filing a proof of claim); (2) fees and costs not directly related to the Chapter 12; and (3) fees and costs related to research for issues that should be known to a secured creditor.[34]

When compared to the above, this Application is an outlier. Here, the Total Amount requested is approximately $45,000. These fees are three to four times higher than other § 506(b) fee requests in other chapter 12 cases. When this Court compares the docket in this case with *Kapperud* and *Somerfeld*, nothing in this case distinguishes it from those bankruptcies. To the contrary, Creditor had a basis to object to Debtor's plans and did so. The objections were neither novel nor complex and did not necessitate a contested hearing. The facts were not disputed, and the applicable law is clear. Nothing in this case was unusual or otherwise explains the vast disparity between the total fees requested in this case and other § 506(b) applications.

Further, unlike other § 506(b) applications, Applicant did not carefully apply this Court's prior decisions or comply with Mont. 2016-1(f). For example, in *In re Hegwood*, the applicant submitted a ten-page fee application which applied each factor under Mont. 2016-1(f) to the applicant's work throughout the case.[35] After doing so, applicant ultimately reduced the total amount billed of $31,914.50 by over 50%. This Court approved an award of fees in the amount of $12,960 and lauded applicant for its scrutiny of its time entries and submission of an application that conforms to this Court's past orders and expectations.[36]

In *In re Whitetail General Constructors, LLC*, this Court approved an award of $3,622.50 pursuant to § 506(b).[37] Again, the applicant submitted a detailed application applying the factors delineated by Mont. 2016-1(f).[38] After applying the factors and recognizing its diminished equity cushion, Applicant reduced its amount billed from $12,250 to fees in the amount $3,622.50 - approximately 70%.

In *In re Winkowitsch*, this Court approved an award of interim professional fees in the amount of $6,338.50.[39] In that case, the applicant reduced the amount sought by $362.50 after

---

[34] *Id.* at ECF No. 119.

[35] 9:21-bk-90188-BPH, ECF No. 76. The applicant negotiated an agreement with the debtor's counsel related to sale of certain real property.

[36] *Id.* at ECF No. 78.

[37] 2:23-bk-20031-BPH, ECF No. 117. The applicant's work in *Whitetail* related to multiple loans and collateral located in different states and a pending sequestration action in Texas.

[38] *Id.* at ECF No. 114.

[39] 4:20-bk-40068-BPH, ECF No. 196.

9

excluding fees and costs related to matters that any creditor would have to undertake, and fees and costs related to research for issues that should be known to the secured creditor.[40]

Unlike the secured creditors in *Hegwood*, *Whitetail General Constructors*, and *Winkowitsch*, Applicant did not engage in a conscientious and independent assessment of whether the fees incurred were reasonable. Applicant failed to exclude fees and costs related to matters that every other creditor would be entitled to undertake, such as filing a proof of claim or notice of appearance. Further, Applicant neither considered the factors enumerated by this Court's prior decisions and Mont. LBR 2016-1(f), nor did the Applicant appropriately reduce the amount requested as a result of this consideration. Instead, the Application reflects a generalized request that this Court conclude that all of the recorded time submitted by Applicant be awarded as reasonable.

### 2. The Application indicates instances where counsel duplicated their efforts.

This Court has scrutinized the time records and concluded duplication occurred. "Duplication" occurs when services provided by one timekeeper mirror those of another professional or paraprofessional. *In re Spiegel*, 2024 Bankr. LEXIS 52, at *4 (Bankr. N.D. Ill. 2024). It is the rare instance when four separate timekeepers bill time on the same matter and there is no duplication of effort. Although Applicant explained to this Court that it had applied a courtesy reduction of $6,748 attributable to duplication, this Court is not persuaded this fully accounts for all the duplication. For example, on August 11, 2022, both Patten and Joki billed 1.9 hours in relation to a telephone conference with Creditor. Although Applicant endeavored to eliminate duplicative billing, not all instances were excluded or reduced.

### 3. A number of time entries are engaged in lumping.

This Court has the discretion to deny fees when services are lumped together in a time entry. *Thomas v. Namba (In re Thomas)*, 2009 Bankr. LEXIS 4529, at *13-14 (B.A.P. 9th Cir. 2009). Lumping frustrates a determination of reasonableness, as the bankruptcy court is prevented from determining the necessity of each service and from fairly evaluating whether individual tasks were expeditiously performed within a reasonable period of time. *Id.* Under Mont. LBR 2016-1,

> Professional fees shall be documented through contemporaneous billing records. Each task shall be itemized separately, identifying the task performed, the amount of time involved, and the fee for each time entry. The Court may deny compensation for tasks that are lumped together in one entry if the cumulative time for those tasks exceeds one hour. Lumping shall be permitted for cumulative tasks which do not exceed one hour.

Although not a persistent problem, Applicant's time records included lumped entries. For example, 6.3 hours were recorded and described as "research and preparation of response to motion to enforce settlement." On the same day, counsel recorded 2.3 hours for ". . . draft stipulation and preparation of memorandum to Gary Deschenes regarding additional terms the Bank is agreeable and terms the Bank cannot agree." Submitting an application with time records

---

[40] *Id.*, at ECF No. 183.

that include entries that are lumped suggests the Application was not thoroughly reviewed prior to filing.

### 4. The Application does not show an appropriate distinction between the partner and associate's time.

Further, while Applicant provided a courtesy discount, the discount was applied to the associate's time, rather than the partner's entries. In some instances, "writing" off an associate's time represents the correct approach. An associate's training and learning reflects a firm's investment in its associate and this investment should not be automatically passed on to a debtor, solely because § 506(b), permits a creditor to reimbursed for the fees its counsel incurred. Where appropriate, a partner must write off an associate's time in recognition of their lack of experience and corresponding inefficiency.

Conversely, a partner with a higher billing rate should delegate as much work as possible to timekeepers with lower rates when the timekeeper with the lower rate can complete the task efficiently and at a lower overall cost than the partner with the higher billing rate. *Olson*, 2020 Mont. B.R. at 142. As the Third Circuit Court of Appeals noted when considering partners billing on matters easily delegable to paraprofessionals or less experienced associates, "[a] Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn." *Ursic v. Bethlehem Mines*, 719 F.2d 670, 676 (3rd Cir. 1983).

Striking the right balance between delegation, achieving efficiency, and getting work into the hands of the timekeeper best suited to complete it competently and at the lowest cost to the client is not always easy. In this case, the vast majority of the time was incurred by the timekeeper with the highest billable rate communicating with Creditor. While it is perfectly reasonable to expect Creditor to communicate with a partner, rather than an associate, the total time incurred doing so in this case cannot reasonably be passed on to the Debtor.

In this case, the timekeeper with the highest billing rate at $330/hour billed 114 hours, while a skilled paralegal with a rate of $175/hour only billed .4 hours. Notably, research focused on the status quo provision objection was completed by a timekeeper with an hourly rate of $255. The time records suggest that the work completed at this rate was efficient and focused. Finally, the last timekeeper with a billing rate of $250 is a new associate and with appropriate supervision likely contributed in a meaningful way. He only billed 14.8 hours. As this Court considers the tasks he completed and the corresponding time recorded, it can find little that is objectionable. The singular cause of the significant fees incurred in this case appears to be constant communication between Creditor and counsel.

This conclusion is borne out by comparison with Debtor's Application, filed roughly a month prior to this Application, which indicates that counsel for Debtor billed 93.70 hours compared to the 152.30 hours Applicant billed. Debtor's counsel's time resolving the dispute with Creditor roughly tracks the same course as Applicant. He attended the same preliminary plan conferences, drafted motions and responses related to the disputes with Creditor and engaged in negotiations with Applicant. Despite handling all tasks related to Debtor's bankruptcy, including matters involving Creditor, Debtor's counsel billed approximately 60 hours less than Applicant on Debtor's bankruptcy.

### 5. The nature, extent, length, and value of the services rendered do not warrant an award of the Total Amount.

Applicant provided no explanation as to the nature, extent, length, and value of the service it rendered Creditor in the Application, forcing this Court to comb through the docket and Applicant's time entries and weigh the services Applicant provided against the requested Total Amount. By this Court's count, Applicant billed and seeks approval of an incredible 33 hours in which Applicant's highest billing attorney engaged in conference calls with members of Creditor, explaining each step of the bankruptcy process. Often, these telephone conversations were accompanied by that attorney's preparation of a memorandum for Creditor's benefit (8 hours billed) or an email (3 hours billed). In total, Applicant seeks approximately $14,500 in fees for Applicant's status updates to Creditor. This Court expects communications to occur between a creditor and its attorney. It does not expect each and every second of those communications to be a line-item expense passed on to Debtor simply because Creditor is oversecured. Creditor must exercise billing judgment when submitting fees for court review of reasonableness.

Further, Applicant seeks an award of fees for items that are either impermissible under § 506(b) or simply part and parcel of those items that every creditor is entitled to do under the Code. For example, Applicant requests $132 in fees for reviewing and discussing with Creditor the Order confirming Debtor's Amended Plan. § 506(b) only applies to those fees post-petition and pre-confirmation. Applicant billed .6 hours for drafting and filing a Notice of Appearance. This is something every creditor is entitled to do. Applicant further spent nearly six hours drafting and filing Creditor's proof of claim. While Applicant reduced the amount billed on this endeavor by half, Applicant still requests compensation for three hours of work. Again, these fees do not fall under § 506(b)'s purview.

Applicant also requested compensation for .3 hours for a "telephone call to Montana clerk of bankruptcy court regarding appropriate event to use for filing motion to extend deadline to respond to motion to enforce settlement." While this Court applauds reaching out to the clerk's office for this sort of guidance, the time incurred doing so should not be included in the Application.

Finally, the stark contrast between the amount of fees requested by Applicant and counsel for Debtor gives this Court pause. This Court can discern no reason why Applicant's fees should be over double those requested by Debtor's counsel, especially since Applicant's attention was focused on only those issues pertinent to Creditor, while Debtor's counsel balanced a multitude of tasks related to Debtor's bankruptcy, including all items related to Creditor.

### 6. The Total Amount requested is excessive given the ordinary issues present in the case.

Apart from constant communication with Creditor, the majority of Applicant's time was spent addressing two issues – the proposed interest rate and the inclusion of a "status quo" provision in Debtor's plan. Applicant spent a significant amount of time researching and briefing these issues. Notwithstanding Applicant's argument otherwise, these issues are not atypical of those found in a chapter 12 case. For example, Applicant spent significant time (approximately 15 hours) researching and drafting the objection to Debtor's Amended Plan based on the lack of a

"status quo" provision. This Court recognizes Creditor has a right to protect its claim. However, it notes that, in similar situations, other creditors have summarized Applicant's position on the inclusion of a "status quo" provision in a single sentence or two.[41] The issue is sufficiently clear, it requires little explanation.

Further, as Applicant explained at the hearing, a significant amount of time was spent between the parties negotiating a resolution to the issues because, as Applicant correctly noted, this Court's preference is compromise. While this Court prefers compromise because the parties retain control over cost-effective outcomes, it does not require it. This Court expects the parties to exercise their professional judgment - when it is no longer cost effective to negotiate, the parties should abandon their efforts. At times, the parties may be better served to simply place the issue in front of this Court and allow it to issue a determination, rather than spend countless hours spinning the negotiation wheel.

### 7. Absent a status quo provision or increased specificity in the Plan, Creditor's interest was potentially at risk.

As this Court has stated in the past, an excessive equity cushion warrants increased scrutiny of a creditor's fee application. *In re Olson*, 2020 Mont. B.R. at 143-44. In this case, Creditor's Claim amounts to $4,085,158.56. The claim is secured by Debtor's real property, which has a market value of $9,520,000, as of the date of the petition. In other words, an equity cushion of approximately 233% protects Creditor's Claim.

Despite the large equity cushions, Creditor's concerns were not meritless. As Creditor explained in the Amended Plan Objection, its insistence on inclusion of a status quo provision was justified by case law where a creditor's failure to insist on clarity regarding whether prepetition terms were modified by the plant had negative consequences post confirmation. Creditor specifically relied on a decision in this district where the District Court concluded that the maturity of a debt could not be accelerated absent a provision in the confirmed plan stating otherwise. *Jim Palmer Trucking*, 2012 U.S. Dist. 20510, at *12-13. Notwithstanding Creditor's interest in protecting its position, this Court cannot conclude that it required 152 hours resulting in almost $50,000 in fees.

### C. Consideration of the factors warrants a reduction in the Total Amount.

Collectively, this Application suffers from numerous deficiencies. First, the overall submission of all the timekeeping billing records and requesting blanket approval of all fees incurred is not consistent with *Dalessio's* recognition that being oversecured is not a "blank check." It suggests no independent judgment or analysis was exercised prior to submission of the Application.

---

[41] *See In re Yurian*, 2:24-bk-20049, Objection to Plan at ECF No. 16. ("The plan should provide that Secured Creditor's trust deed lien and other loan terms remain in effect and are not modified except as expressly provided in the plan."). Such language is sufficient as "the overwhelming majority of courts have refused to modify or alter the lien retained pursuant to § 1225(a)(5)(B)(i) in any way." *In re Heath*, 483 B.R. 708, 712-13 (Bankr. E.D. Ark. 2012).

Next, prior chapter 12 cases that are similar to this case resulted in awards that were significantly less than the Total Amount requested here, generally by a factor of two or three. The issues in this case were ordinary, and this Court would expect the fees to be consistent with the fees incurred in the similar cases: $10,000 - $15,000.

Third, duplication and lumping is evident in the timekeeping and frustrates this Court's ability to analyze the time entries. On those occasions when this Court notes timekeeping errors, such as in these billing submissions, it signals that an applicant has likely not sufficiently scrutinized its own billings records before filing their application.

Having considered many factors and scrutinized the Application, this Court is not persuaded that an award of almost $50,000 in fees is reasonable. Instead, based on this Court's familiarity with the rates and billing practices of similar counsel in similar cases, the only conclusion it can draw is that an award of $10,000 – $15,000 is reasonable. Further, when this Court considers the total fees incurred by Debtor's counsel was approximately $22,000, handling the same issues and likely many others, Applicant's request is unreasonable. Reasonable fees in this case for Applicant are $12,500. This reflects an award that is consistent with the fees awarded to counsel for oversecured creditors in similar chapter 12 cases.

## VI.  Conclusion.

Mont. LBR 2016-1(f) requires all applicants seeking compensation pursuant to § 506(b) to undertake a reasonableness analysis of their fees and discount them accordingly. Applicant failed to do so, leaving that burden on this Court. Scrutiny of Applicant's fees reveals the Total Amount requested is unreasonable. As a result, this Court shall only approve a portion of the Total Amount. An Order will be entered separately.

Dated June 7, 2024.

BY THE COURT:

Hon. Benjamin P. Hursh
United States Bankruptcy Court
District of Montana